IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
v.                              )          No. 06-10017-01-WEB
                                )
ALMARIO D. SMITH,               )
                                )
                    Defendant.  )
_____ )

**Memorandum and Order**

This matter came before the court on the defendant's motion to suppress evidence.  The court held

an evidentiary hearing on June 5, 2006, and orally denied the motion at the conclusion of the hearing.  This

written memorandum will supplement the court's oral ruling.

I.  *Facts.*

The court finds the following facts from the evidence presented at the hearing.   On January 13,

2006, Special Agents John Durastanti and Steve Thompson of the U.S. Bureau of Alcohol, Tobacco,

Firearms and Explosives (hereinafter "ATF") were on duty searching for a fugitive in the area of 13th and

Roosevelt Streets in Wichita, Ks.  The agents were driving an unmarked blue Ford Explorer and were

dressed in plain clothes.  Just before 3 p.m., as they were driving down the street, they saw a vehicle

coming toward them at a high rate of speed.  The vehicle, a white Lincoln Towncar, accelerated down a

small hill and nearly bottomed out.  Agent Durastanti estimated the vehicle was traveling in excess of 45

miles per hour when they first saw it and that it accelerated to over 70 miles per hour at the bottom of the

hill. The car was exceeding the posted speed limit. It looked to Durastanti like the car was beginning to "fishtail" and that the driver was about to lose control. In an apparent attempt to keep control, the driver turned the Lincoln towards the agents' car, which caused Durastanti to pull over to the curb to avoid being hit. As the Lincoln passed by, Durastanti could see that the driver was a young black male and that there were other individuals in the car. When Durastanti looked in his rear view mirror after the car passed by, it appeared to him the car had no rear license plate.

Durastanti testified that the area from which the Lincoln had come -- 13th Street between Hillside and Oliver streets -- was known to be a high-crime area with significant violent gang activity and drug trafficking. Based on this fact and the erratic driving of the Lincoln, the officers suspected the individuals in the car might be fleeing the scene of a crime or might otherwise be involved in criminal activity. The agents decided to break off their search for the fugitive and follow the Lincoln. After they turned around and caught up with the Lincoln, and after several turns, the agents saw the car stop at the curb in front of a residence. They could see three occupants conversing in the car. One of the individuals got out and ran into the residence, re-emerging in less than a minute. The agents, meanwhile, saw that the Lincoln had a "dealer tag" on it, and Agent Durastanti radioed for a check of the license plate. He was informed that the Wichita Police Department's "SPIDER" database did not show the license on file. After the individual came out of the house and got back in the car, the Lincoln again took off at a high rate of speed. The agents followed, at times closing to within a short distance of the Lincoln. When they did so, Agent Durastanti radioed a request for a uniformed officer to make a traffic stop of the Lincoln. He included the fact that the car had been driving erratically and had almost hit them. Durastanti held his radio unit up to his mouth as he did so because, he testified, he wanted the individuals in the Lincoln to know that he was

a law enforcement officer and he wanted to see what their reaction would be.  He thought the individuals in the car saw him using the radio and that one or more of them made a cell phone call immediately thereafter.  The agents continued to follow the car and to radio in its location.

Kansas Highway Patrol Trooper Tom Spencer was on patrol when heard the request for a uniformed officer to stop the Lincoln.  He responded and drove toward the location of the Lincoln and the ATF agents.  Spencer proceeded west on U.S. Highway 54 and exited at the Meridian street exit.  He saw the Lincoln several cars ahead of him in a line of cars on the exit ramp waiting at a stop light.  When the light changed, the cars, including the Lincoln, turned left on Meridian street.  The agents' Explorer followed just behind the Lincoln.  Spencer followed several cars behind.  After he turned the corner, Spencer accelerated up towards the Lincoln.  He passed by the agents' Explorer, which had slowed along the curb, and saw the Lincoln turning right into the parking lot of a Valero convenience store.  Spencer turned on his emergency lights and pulled in the lot behind the Lincoln.  The ATF agents, meanwhile, entered the same convenience store parking lot through another entrance just ahead of the one used by the Lincoln and Spencer.  The agents parked their Explorer off to the side of and slightly in front of the Lincoln.  The agent's vehicle was basically pointing the opposite direction of the Lincoln.  At some point Spencer ran a check on the "dealer tag" on the Lincoln and confirmed that it was properly registered to a local car dealer.

The Lincoln was on the east side of the convenience store.  Spencer noticed that the car slowly came to a stop.  The car was not in a parking stall, but was behind a row of parking stalls on the side of the store and was perpendicular to them.  Spencer's marked highway patrol car was about one car length behind the Lincoln, with its emergency lights flashing.  Spencer saw that the ATF agents had also pulled

3

into the lot.  Spencer saw three individuals in the Lincoln -- two in the front and one in the back.  He saw the driver and the back seat passenger (on the passenger side of the vehicle) open their doors and start to get out.  Spencer, meanwhile, opened his door, stepped out, and loudly told the individuals to have a seat in the vehicle.  Spencer had to repeat his command, but the individuals complied, getting back in the car.  Either by this time or shortly thereafter, all three of the individuals in the Lincoln saw that Spencer was a uniformed officer and that the emergency lights on his vehicle were flashing.  They also heard his command to get back in the car.  Spencer could see that the three individuals were talking with each other in the vehicle.  He yelled to them that he wanted to see their hands, and he extended his own hands to show them what he wanted them to do.  They did not react.  Unsure whether they could hear him, Spencer bent down into his car to obtain a loudspeaker microphone.  When he came back up, he saw that the Lincoln had started to move forward.  He got into his patrol car and began to pursue the Lincoln, not noticing where the ATF agents were because he was focused on the Lincoln.

Agent Durastanti testified that when he and Thompson pulled into the lot, he was somewhat suspicious of the way the Lincoln had come to a stop.  The vehicle was parked on the side of the store, not in a parking stall, and was more or less pointed at a driveway leading out of the lot.  Agents Thompson and Durastanti were getting out of their Explorer about the time Trooper Spencer ordered the occupants of the Lincoln to get back in the car.  Agent Durastanti testified that he saw the Lincoln creeping forward at about the time Agent Thompson, who was on the side of the Explorer nearest the Lincoln, approached the car.  Durastanti got out and was coming around the rear of the Explorer when he heard Thompson identify himself as a law enforcement officer.  Durastanti's view of the Lincoln at that moment was somewhat blocked by the agents' Explorer.  Durastanti heard a commotion and a car moving.  He drew his firearm

4

and ran out from behind the Explorer.  When he did so, he saw the Lincoln coming at him.  He saw the driver apparently bracing for impact as the car accelerated toward him.  According to Durastanti's testimony -- which was essentially uncontradicted -- he had no chance to get out of the way.  Believing he might be seriously injured or killed, Durastanti fired two shots at the driver in an attempt to make him stop.  Durastanti jumped up to avoid being run over and went up on the hood of the vehicle.  As the Lincoln exited the driveway and turned right, Durastanti slid off of the hood into the street, landing on his feet.  Due to his momentum, he spun around one time until he was again facing the Lincoln.  He testified that his impression at the time was that the vehicle was still sliding toward him as it was turning.  He quickly fired two more shots toward the driver.  When he realized the car had turned and was accelerating away, he ceased firing.  Durastanti had a pain in his knee, and he went over to the curb and sat down.

Trooper Spencer, meanwhile, had gotten into his patrol car and started after the Lincoln.  The video recording from Spencer's camera shows a portion of the incident, including Agent Durastanti up on the hood of the Lincoln as it turns, and it shows him rolling off the hood and firing two shots after he landed on his feet in the street.  Spencer pursued the Lincoln south on Meridian street.  When the Lincoln turned east at the next intersection, on to McCormack street, Spencer saw that the car slowed and the driver's door came open.  Spencer saw the driver throw out what appeared to be plastic baggies and he knew from his experience that the baggies likely contained controlled substances.  The Lincoln continued to move slowly forward, and a short distance thereafter turned again, this time onto Sedgwick, a street with no outlet.  The Lincoln then pulled over to the side of the street and stopped.  The driver -- defendant Almario Smith -- and one or more of the other individuals began to get out when Spencer stopped a short distance behind them and yelled at them to get their hands up.  He then told them to get on the ground.  They complied.

Other officer arrived shortly thereafter and arrested all three individuals.

II. *Motion to Suppress.*

The defendant concedes the officers might have had reason to suspect him of speeding, but argues they had no information that he or the other occupants of the Lincoln were armed or dangerous. He alleges that the ATF agents confronted him with weapons drawn and that one of the agents then shot him, which he argues constituted an arrest for which there was no probable cause. He further contends the force used by the ATF agent was excessive and unreasonable under the Fourth Amendment. Defendant maintains that the agents intentionally placed themselves in front of the moving Lincoln and thereby caused a situation of peril to themselves. Defendant's brief asserts that Trooper Spencer's vehicle was not visible to the occupants of the Lincoln and that the defendant drove away when he was approached by the undercover ATF agents because he believed he was being robbed. Lastly, defendant contends the discovery of drugs (i.e. the drugs thrown into the street during the pursuit) was a product of the unreasonable seizure and must be suppressed.

The Government argues that the officers had reasonable cause to believe the driver of the Lincoln had committed traffic violations and to suspect that the occupants of the vehicle were involved in other criminal activity. It argues that a stop of the vehicle was therefore reasonable and lawful. The Government argues, contrary to the assertions in defendant's motion, that there was no detention of the defendant or the Lincoln at the Valero parking lot because the Lincoln fled before Trooper Spencer was able to approach the occupants. In the process, the Government says, the defendant committed the additional violations of fleeing from an officer and assaulting the ATF agents. The Government argues the defendant threw the drugs out of the car prior to being apprehended, which constitutes an abandonment of the items

under *California v. Hodari D.*, 499 U.S. 621 (1991). The Government disputes the defendant's argument that he was seized when the agent shot at him, noting that the defendant drove away from the area of the shooting, threw drugs out of the car, and then stopped the vehicle on a dead-end street.

III. *Discussion*.

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Whren v. United States*, 517 U.S. 806, 809-10 (1996). The Supreme Court has stated that a seizure occurs when an officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen. *Florida v. Bostwick*, 501 U.S. 429, 433 (1991). In *California v. Hodari D.*, 499 U.S. 621 (1991), the Court held that a police officer's mere pursuit of a fleeing individual did not constitute a "seizure" of the person under the Fourth Amendment because such a seizure requires either the application of physical force or, absent such force, submission by the individual to an assertion of authority. *Id*. at 626. In the instant case, the use of emergency lights by the uniformed Trooper and his command to the individuals to have a seat in the car constituted a show of authority, and a reasonable person in such circumstances would not have felt free to end the encounter or to leave. The evidence shows that the defendant and his companions initially complied - albeit briefly - with Trooper Spencer's command to be seated in their car. During that brief period of compliance, the court concludes that a "seizure" of the defendant occurred within the meaning of the Fourth Amendment. *Cf. Hodari D.*, 499 U.S. at 625 (noting that a seizure is a single act, not a continuous fact; an arrest may occur from an officer's laying on of hands but does not continue if the person breaks away and becomes a fugitive). *See also Whren, supra* (temporary detention of individuals during the stop of an automobile by the police, even for a brief period and for a limited purpose, constitutes a "seizure" of those

persons within the meaning of the Fourth Amendment.).  The seizure ended quickly thereafter, however, when the defendant began to flee from the scene.

Under Tenth Circuit case law, routine traffic stops are analyzed under the framework for investigative stops established by *Terry v. Ohio*, 392 U.S. 1 (1968).  Under that standard, a traffic stop (or an investigative detention) is reasonable if the officer's action was justified at its inception and the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place.  *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir.1995) (en banc).  A traffic stop is reasonable at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.  *United States v. Ramstad*, 308 F.3d 1139, 1144 (10th Cir. 2002) (citations omitted).  There is no question that Trooper Spencer had probable cause to believe the defendant committed traffic violations which justified a stop of the vehicle and a detention of its occupants.  Trooper Spencer had been informed by the ATF agents that  they had just seen the Lincoln speeding and driving in a dangerous and erratic fashion.  Defendant has not argued that the Trooper was precluded from relying upon this information from the ATF agents.  *Cf. United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982) ("In assessing whether the police in this case had sufficient justification to make an investigatory stop we must, of course, look to the knowledge of all the police involved in this criminal investigation....").  The court further finds that the officers were aware of specific, articulable facts -- including the Lincoln's high-speed emergence from a known high-crime area and its erratic and dangerous maneuvering  -- which justified a reasonable suspicion that the occupants might be involved in other criminal activity.  Under the circumstances, the Trooper had reasonable grounds

to detain the individuals for a traffic stop and to investigate the reasons for the erratic driving.  As such, the initial stop of the Lincoln and its occupants was reasonable under the Fourth Amendment.

The court rejects defendant's contention that the ATF agents unlawfully arrested him by approaching his vehicle with their weapons drawn.  First of all, the testimony presented at the hearing indicated that neither ATF agent approached the Lincoln with a gun drawn *before* the defendant began his flight from the parking lot.  Rather, the agents drew their weapons *after* the defendant evinced an intent to flee by beginning to move his vehicle forward.  Moreover, the court concludes that  the defendant's prior erratic and dangerous driving and the other known circumstances gave the officers reasonable grounds to be concerned for their safety as they approached the vehicle.  In addition to the possibility that the car had been fleeing from criminal activity when they first saw it, the officers were aware that there were three individuals in the car and that they had stopped in an unusual position on the lot where they had ready access to a driveway exit.  And before Agent Durastanti drew his firearm, he saw the Lincoln creeping forward, indicating a possibility that the occupants were perhaps unsure about stopping or were contemplating fleeing, which would have presented a danger to the officers or anyone else in the area.  As such, the court concludes the officers had reasonable grounds to be concerned for their safety, and that their drawing of firearms under the circumstances was reasonable.  *Cf. United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993) (noting that when officers have a reasonable concern for their safety, circumstances reasonably indicate that individuals are dangerous, courts allow officers conducting *Terry* stop to draw weapons) ;  *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir.1982) ("While the use of guns during a *Terry* stop normally elevates the seizure to a formal arrest, the display of firearms is permissible without probable cause if the officers "reasonably believe that [firearms] are necessary for their

9

protection."). Finally, under the rule of *Hodari D.,* the fact that the officers drew their weapons as they approached did not in itself amount to a seizure, because the evidence showed that the defendant attempted to flee as the ATF agents approached. Thus, although the officers used a show of authority and attempted to seize the defendant, there was no application of physical force by them at that point, nor was there a submission by the defendant to the agents' show of authority. The ATF agents' actions in this regard did not constitute a seizure of the defendant and did not violate the Fourth Amendment.

Agent Durastanti's firing of shots at the defendant presents a more difficult question. According to *Hodari D.,* an arrest occurs with "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee." *Hodari D.*, 499 U.S. at 624. Thus, an arrest occurs "merely by touching, however slightly, the body of the accused," even though the officer does not succeed in stopping the individual. *Id*. The Tenth Circuit has interpreted this to mean "that when law enforcement officers shoot at a fleeing suspect, a 'seizure' occurs only if the shot strikes the fleeing person or if the shot causes the fleeing person to submit to this show of authority." *Bella v*. *Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994). *See also Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993) (shots fired at truck driver did not result in seizure until driver was struck by a bullet); *Adams v*. *City of Auburn Hills*, 336 F.3d 515, 519-20 (6th Cir. 2003) (the use of deadly force alone does not constitute a seizure). In this case, the defendant claimed in his brief that he was hit in the head by one of the agent's shots and that his wound forced him to stop the vehicle. Although it is not clear whether the Government controverts the allegation that defendant was in fact wounded by the agent, the court recalls no specific evidence at the suppression hearing to establish that fact. Absent a showing that the defendant was actually hit by one or more of the agent's shots (or by some instrumentality caused by the agent), there is no showing that the officer applied

10

physical force within the meaning of *Hodari D.* or *Bella v. Chamberlain*.[1]  Moreover, the evidence refutes

any suggestion that the firing of the shots caused the defendant to submit himself to arrest.  *Cf. Bella*, 24

F.3d at 1255 (although officers eventually forced the individuals in a helicopter to land, the shots fired by

the officer did not result in a seizure because they did not cause the individuals to submit).  As the

Government points out, notwithstanding the four shots fired by Agent Durastanti,  the defendant turned the

Lincoln out of the Valero parking lot and continued on down the street, with Trooper Spencer in hot

pursuit.  Defendant turned at the next intersection and then opened his car door, throwing out baggies

containing controlled substances, before closing the door and proceeding forward, albeit rather slowly.

Defendant turned again at the next corner -- onto what was a dead-end street -- before bringing the car

to a stop,  getting out, and raising his hands.  It is fair to say at that point the defendant was seized, as

shown by his submission to the show of authority by the Trooper.  Under the evidence presented, however,

there was no seizure after the defendant fled the Valero lot until he stopped the Lincoln on Sedgwick street

and surrendered.  Of course, at that point the officers had probable cause to believe the defendant had

committed several offenses, including fleeing from an officer and assaulting the ATF agent, and that he was

a danger to the officers.  The defendant's arrest at that point was clearly supported by probable cause and

was reasonable.

   Even if the evidence at the hearing could support a finding that the defendant was hit or injured by

---

  [1] Although the Government bears the burden of showing the *reasonableness* of a warrantless seizure, *United States v. Seslar*, 996 F.2d 1058, 1062 (10th Cir. 1993), the court concludes that the burden is on the defendant in this instance to show that the officer applied physical force to him.  *Cf. United States v. Carhee*, 27 F.3d 1493 (10th Cir. 1994) (defendant bears the burden of proving whether and when the Fourth Amendment was implicated (i.e., the point at which he or his luggage was "seized").

one of Durastanti's shots, the court would nevertheless find that the seizure was reasonable.  Assuming the defendant was hit, the agent's use of such force would constitute a seizure within the meaning of *Hodari D.*  And as defendant points out, the amount of force used by a law enforcement officer in making an arrest is subject to the reasonableness requirement of the Fourth Amendment.  Reasonableness depends not only on when a seizure is made, but also on how it is carried out.  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  *See also Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Determining whether the force used to effect a particular seizure is reasonable requires the court to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.  The Supreme Court has long held that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  *Id.*  The reasonableness of a particular use of force is considered from the perspective of the officer on the scene, allowing for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.  *Id.* at 397.  There is no precise formula, but relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  The focus is on whether the actions of the officer are objectively reasonable in light of the information the officers had when the conduct occurred.  *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

The use of deadly force is justified under the Fourth Amendment "if a reasonable officer in the [officer's] position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Phillips v. James*, 422 F.3d 1075, 1083 (10th Cir. 2005) (citing *Sevier*

12

*v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir.1995)).  Critical factors in the totality of the circumstances' inquiry may include "whether the officers were in danger at the precise moment that they used force and ... whether [the officers'] own reckless or deliberate conduct [] during the seizure unreasonably created the need to use such force." *Sevier*, 60 F.3d at 699.

As noted above, at the time of the initial seizure by Trooper Spencer the officers had probable cause to believe the driver of the Lincoln had committed traffic violations, including speeding, and they could therefore lawfully make a traffic or investigatory stop.  By the time Agent Durastanti came around the back of the Ford Explorer, he had probable cause to believe the individuals in the Lincoln were attempting to unlawfully flee from Spencer.  He saw that the Lincoln was coming at him and that the driver appeared to be willing to run him over in order to get away.  Significantly, there is nothing in the record to contradict or undermine Durastanti's testimony that when he came around the Explorer he did not have an opportunity to get out of the way before the Lincoln hit him.  The evidence refutes any claim that Durastanti recklessly or negligently placed himself in a situation where use of deadly force was required.  Moreover, Durastanti's testimony established that he had a reasonable belief that he was in immediate danger of death or serious bodily injury from the vehicle as it approached, such that his use of deadly force at that point in an attempt to deter or disable the driver was reasonable under the circumstances.  The evidence showed that Durastanti fired two shots at the driver of the vehicle as the car approached him.  After Durastanti was hit by the vehicle and slid off the fender into the street, he fired two more shots at the driver as the vehicle was continuing to accelerate.  The evidence was less clear that these latter two shots were necessary to protect the life of the agent, but Durastanti testified that his impression at the time was that the Lincoln was still sliding toward him.  Although the videotape and the other evidence indicates that Durastanti was

13

probably mistaken in this belief, the agent's belief was nevertheless reasonable under the circumstances. Among other things, the court notes that at the time he fired the last two shots Durastanti had just been struck by the Lincoln and was still perilously close to being hit again or run over. The driver of the Lincoln had already evinced a willingness to use the vehicle against him in order to get away. Also, immediately prior to firing these shots, Durastanti slid off the hood of the car into the street and then had to spin around to see the Lincoln as it continued to turn just behind him and/or next to him. It was obviously difficult under such circumstances to accurately gauge the movement and path of the vehicle. The agent had no time to evaluate the situation, but had to make a split-second decision concerning the threat posed by the vehicle and the continuing need to use deadly force. Even if the officer's belief that the vehicle still posed a serious threat to him at that point was mistaken, it was a reasonable belief under the circumstances. *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances ... and in those situations courts will not hold that they have violated the Constitution). Under the circumstances, the court concludes that the officer did not use constitutionally excessive force and that the seizure of the defendant was reasonable under the totality of circumstances. The court also finds that the drugs abandoned by the defendant in the street as he was being pursued by the Trooper were not discovered as a result of an unlawful seizure and are not subject to suppression. *Cf. Hodari D.*, 499 U.S. at 625.

IV.  *Conclusion.*

Defendant's Motion for Extension of Time to File Suppression Motion (Doc. 23) is GRANTED insofar as it requests leave to file the motion out of time. It is DENIED insofar as it requested a continuance of the trial.

14

Defendant's Motion to Suppress (Doc. 24) is DENIED.

IT IS SO ORDERED this __16th__ Day of June, 2006, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge